JEFFRY K. FINER
West 35 Main • Suite 300
Spokane, WA 99201
(509) 981-8960

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR-11-159-RHW |
| | ) | |
| Plaintiff, | ) | DEFENDANT'S SENTENCING |
| | ) | MEMORANDUM |
| vs. | ) | |
| | ) | |
| DORIS E. NELSON, | ) | |
| | ) | |
| Defendant. | ) | |

Now comes the Defendant, Doris E. Nelson, by and through her

attorneys, Jeffry K. Finer and Elizabeth Kelley, and hereby submits this

Sentencing Memorandum in advance of her sentencing hearing currently

scheduled for November 3, 2014.

## DORIS NELSON'S BACKGROUND AND THE RISE OF THE LITTLE LOAN SHOPPE

Doris Nelson is a mother, grandmother, wife, and daughter.   She is a

55-year-old woman with no criminal record.   Whatever the amount lost by

investors, the fact remains that for several years, Ms. Nelson, in her capacity

Jeffry K. Finer PS
35 W Main Street • Suite 300
Spokane, Washington • 99201
509.464.7611 jeffry@finer-bering.com

as owner of the Little Loan Shoppe, distributed millions of dollars in loans and helped countless low- and middle-income individuals. She was an original member of the Online Lenders Association, a Washington, DC-based trade group which developed a detailed code of best practices for consumer loans. Prior to her indictment, she was active in her community and church. She is in fragile health and under the care of a psychiatrist.

### a. Social History

She was born Doris Elizabeth Larnbertis on March 22, 1959, in Vancouver, British Columbia. Ms. Nelson moved to Honolulu, Hawaii in 1964 with her mother and her new stepfather. After attending elementary schools in Honolulu, Doris moved with her mother back to Vancouver, B.C., where she attended Como Lake Junior High School through the tenth grade.

Doris Nelson did not complete her high school education. At age 18, Ms. Nelson had a job selling encyclopedias for a short time. She soon relocated to Edmonton, Alberta, Canada to work as a secretary for a silkscreen printer. After a short time she moved back to Vancouver to take a job with Grantree Furniture Rental. Soon thereafter she took a job with Smithrite Disposal, in telephone sales, where she worked for about four years. In 1981, she married at age 22. Two years later, on March 6, 1983, she gave birth to her

Jeffry K Finer PS
35 W Main Street • Suite 300
Spokane, Washington • 99201
509.464.7611  jeffry@finer-bering.com

first child. Her employer, Smithrite, offered her a buyout in 1983, which she accepted because they had sold the company.

While at home in 1983, Ms. Nelson turned to self-employment selling coupon books. She ran that business for about six years. Her second child was born in 1986. Ms. Nelson and her husband, now with two children, separated in 1991, and divorced in 1993. Her third child was born in 1994.

**b.    Entry into the payday loan industry**

In 1997, Ms. Nelson, now single and with three children to raise, applied for a payday loan, and paid it in full when it came due. She became interested in how the loan process worked as she was looking for a job which would allow her to stay at home with her children.   She   explored starting her own payday loan business. She took on a partner, and they went to various banks in order to get financing. All the banks turned them down.   Ms. Nelson and her partner persisted. They opened a payday loan business at a storefront shop in Abbotsford, B.C., calling it The Little Loan Shoppe.   They used their own funds to start the business, along with funds from others.

A payday loan is typically a loan for a period covering the time between paychecks; in contrast, a shortterm loan usually involves scheduled repayments of both principal and interest.   The Little Loan Shoppe business

Jeffry K Finer PS
35 W Main Street • Suite 300
Spokane, Washington • 99201
509.464.7611   jeffry@finer-bering.com

model called for applicants to submit their pay stubs and complete an application. The business would then check to make sure the potential customer was actually employed. The payday loan business charged $25 for every $100 borrowed, up to a maximum of $500. That first year the business had to turn potential customers away because it ran out of funds with which to make loans. Within two years The Little Loan Shoppe had four stores in the Abbotsford area.

### c. Early expansion of Little Loan Shoppe

After about five years running the storefront payday loan businesses, in the Spring of 2002 or 2003, the business expanded further, getting two 1-800 telephone numbers, and advertising throughout British Columbia. Then, in 2004, the business began advertising all across Canada, except for Quebec. It utilized television ads and yellow pages' ads. Doris Nelson was at this time living in the United States, having moved here in 2001 in order to be with her new husband, Dennis Nelson.

Storefronts in Spokane were opened in 2002, and the storefronts in Canada were closed in 2003. The Spokane stores were located on East Mission Street, in Airway Heights, on Mullan Road, and on Northwest Boulevard. Eventually the business moved to a two-story building on West Broadway in

Jeffry K Finer PS
35 W Main Street • Suite 300
Spokane, Washington • 99201
509.464.7611 jeffry@finer-bering.com

Spokane, which location became the main business office for The Little Loan Shoppe. The 1-800 telephone system calls rang into the West Broadway building in Spokane. By this time, 2003, the business had customers in Washington, Idaho, and across Canada.

In the Fall of 2005, along with TD Canada Trust, the business began using Wells Fargo Bank, Spokane, Washington. This was done because Wells Fargo could work with customers in both Canada and the United States, and whereas TD Canada Trust could not operate outside of Canada.

### d.    Involvement of "Investor Enablers"

In 2005 the business opened certain corporations in Canada, each one a company with a bank account. Those bank accounts were utilized to repay investors or to receive investment funds. Ms. Nelson opened these businesses on the advice of Paul Cooper, Alex Mirrow and Margaret Miller – described by bankruptcy examiner Charles Hall as "investor enablers." Cooper toured the stores in Abbotsford before they closed. Cooper and his sister, Miller, then started their own company so solicit investments for The Little Loan Shoppe. They were paid an agreed commission for each investment they brought into The Little Loan Shoppe. Cooper then met Alex Mirrow, a fellow congregant within the Jehovah Witnesses. Alex Mirrow investigated The Little Loan

Jeffry K Finer PS
35 W Main Street • Suite 300
Spokane, Washington • 99201
509.464.7611  jeffry@finer-bering.com

Shoppe, and thereafter invested several hundred thousand dollars in the company. Mirrow was paid commissions and also referred potential investors to Cooper. The majority of investors brought in by Cooper and Mirrow were also Jehovah Witnesses.

### e. Bad debts and failed profitability

The Little Loan Shoppe made minimal profit in 2006-2007. In 2006, the Little Loan Shoppe took a bad debt write-off of at least a million dollars, and in 2007, of five million dollars. Moreover, she communicated to her investors that the company was having difficulties.

The payday loan business by now was staffed by a company called Team Spirit America (TSA). This company ran the call center for LLS America and LLS Canada. The offices on West Broadway Avenue also housed Global Edge Marketing (GEM), a lead provider which began in 2007- 2008, owned by Dennis Nelson. In the summer of 2008, TSA employed approximately 160 persons. Doris Nelson was the only employee for The Little Loan Shoppe.

Meanwhile, the economy was poised on the worst economic downturn since the Great Depression. In September 2008, Ms. Nelson realized that her company was in deep trouble as consumer payday repayment rates plummeted

Jeffry K Finer PS
35 W Main Street • Suite 300
Spokane, Washington • 99201
509.464.7611 jeffry@finer-bering.com

but her obligations to the investors piled higher and higher. As a result, she stopped accepting investment funds, and hired Fruci and Associates, a Spokane, Washington accounting firm to assist with the accounting work. The last investment received by The Little Loan Shoppe was on September 23, 2008, although the business operated for another four years. Pressure from Wells Fargo to collect bad debts increased to the point that electronic payment submissions ("ACH" debit systems) were resulting in bank charges for insufficient funds that wildly exceeded the minimal debits collected. In one month alone, bank charges exceeded $283,000. The Little Loan Shoppe was hemorrhaging from commission debts to the investors, plummeting income from consumer loan repayments, and crippling bank charges.

In early October 2008, Ms. Nelson notified all investors that the interest payments were only going to be 10% from that point on. At about that same time B.C. Securities issued a cease and desist letter on October 7, 2008.

The Little Loan Shoppe was brought into bankruptcy court involuntarily in Spokane, and voluntarily in Nevada. Ms. Nelson was not involved in the business from March 2009 to October 22, 2009. At first Ms. Nelson's son, Chris Foster, ran the company to June 6, 2009. Then Ralph Gamble, who had previously been the manager of the sales floor and bad debt collection, was

Jeffry K Finer PS
35 W Main Street • Suite 300
Spokane, Washington • 99201
509.464.7611 jeffry@finer-bering.com

called in to run the company.

On October 22, 2009, Ms. Nelson was reinstalled as the head of the business, and ran it for another 20 months. Under the bankruptcy automatic stay, the company made a profit from July 21, 2009 to June 2012, at which time the company was shut down.

On April 6, 2010, government investigators served search warrants on the Nelson residence as well as on the offices of The Little Loan Shoppe, seizing all checks, hard drives, investor information, vehicles, jewelry, artwork, a recreational vehicle, and some cash. Ms. Nelson continued to run the company until the trustee in bankruptcy took over on April 23, 2011. Ms. Nelson was arrested on November 17, 2011. She spent the holidays in the Spokane County Jail while her husband raised funds for her bond.

## BRIEF HISTORY OF THE CASE

On April 3, 2014, after her case had been pending for approximately three years, Ms. Nelson, on the advice of previous counsel, pled open to the 110 count indictment. The indictment included seventy-one counts of Wire Fraud in violation of 18 U.S.C. Section 1343 (Counts 1-71); twenty-two counts of Mail Fraud, in violation of 18 U.S.C. Section 1341 (Counts 72-93); and seventeen counts of International Money Laundering, in violation of 18

Jeffry K Finer PS
35 W Main Street • Suite 300
Spokane, Washington • 99201
509.464.7611 jeffry@finer-bering.com

U.S.C. Section 1956 (a)(2)(A) (Counts 94-110). Ms. Nelson had previously

rejected two written plea agreements which included sentences of ten and

twenty years.

On July 9, 2014, undersigned counsel, on behalf of Ms. Nelson, filed a

Motion to Withdraw Guilty Plea. The Motion was accompanied by a

Memorandum and six declarations; testimony was not offered. On July 14,

2014, the Court denied the Motion and set sentencing for November 3, 2014.

During the approximately four months during which present counsel has

been involved in this case, it has discovered voluminous evidence which was

either never turned over to the defense, or if turned over not put to use,

including additional expert reports and witnesses rebutting the government's

expert. Defense counsel continues its investigation nothwithstanding

inadequate funding for experts, but nonetheless finds itself filing this

Memorandum on this date as ordered by the Court.

## THE INDICTMENT

Although Ms. Nelson's admission to a factual basis for her open plea

stands in the eyes of the Court, she takes issue with the following points as the

affect this Court's determination of relevant conduct and the loss calculation:

As a general matter, the term Ponzi does not appear in the federal

Jeffry K Finer PS
35 W Main Street • Suite 300
Spokane, Washington • 99201
509.464.7611 jeffry@finer-boring.com

criminal code. The term is well defined in bankruptcy law. A Ponzi scheme is a financial fraud that induces investment by promising extremely high, risk-free returns, usually in a short time period, from an allegedly legitimate business venture. "The fraud consists of funnelling proceeds received from new investors to previous investors in the guise of profits from the alleged business venture, thereby cultivating an illusion that a legitimate profit-making business opportunity exists and inducing further investment. *In re United Energy Corp.*, 944 F.2d 589, 590 n.1 (9th Cir. 1991). *See generally Cunningham v. Brown*, 265 U.S. 1, 7-9, 44 S.Ct. 424, 68 L.Ed. 873 (1924)(detailing the remarkable criminal financial career of Charles Ponzi); *Donnell v. Kowell*, 533 F.3d 762, 767 n.2 (9th Cir. 2008).

On page 4, paragraph nine, it is not true that Doris Nelson exercised control over 360 Northwest Telecom LLC.

On page 4, paragraph 10, it is not true that Doris Nelson exercised control over D&D Associates LLC.

On page 5-6, paragraph 16, it is not true that Doris Nelson exercised control over Global Edge Marketing LLC.

On page 6, paragraph 17, it is not true that Doris Nelson exercised control over D & C Lead Marketing LLC.

Jeffry K Finer PS
35 W Main Street • Suite 300
Spokane, Washington • 99201
509.464.7611 jeffry@finer-bering.com

On page 11, paragraph 27, the Court should be aware that the defendant ran a legitimate business lending money to tens of thousands of people. In some years the company made a profit, and some years the company operated at a loss. It is improper to characterize the business as a Ponzi scheme. Indeed, five different sources conclude that the Little Loan Shoppe was not a Ponzi scheme: the forensic report compiled by A & M which was retained by previous counsel; the report submitted by Marie Rice in the bankruptcy proceeding; the Declaration submitted by Lenore Romney in the bankruptcy proceeding; the Declaration submitted by Conrad Lysiak in the Motion to Vacate Plea (ECF No. 224); and the Declaration submitted by John Munding in the Motion to Continue Sentencing to be filed later with this Court. *See* Declaration of John Munding.

On page 12, paragraph 28, the court should be aware that there are no "Defendant Businesses." There were in the original Indictment, but eliminated in the Superseding Indictment.

On page 13, paragraph 31, the business utilized banks in both Canada and the United States in order to accept payment on loans and to deposit investor funds. In the United States the business used Bank of America, and Wells Fargo Bank. The business used TD Canada Trust in order to debit the

Jeffry K Finer PS
35 W Main Street • Suite 300
Spokane, Washington • 99201
509.464.7611 jeffry@finer-bering.com

accounts of loan customers in Canada. That ended in 2005 when the business opened an account at Wells Fargo, here in Spokane, to debit customer accounts in both the United States and Canada.

On page 13, paragraph 32, the Superseding Indictment uses the phrase "exorbitant lulling payments." In fact, the interest payments to investors were what the investors had contracted for, what they expected. They were derived from a high-risk business charging extremely high rates of interest to short-term borrowers as was known to the principal investment recruiters. *That is the nature of the payday loan business.* The investors received promissory notes for their investments and post-dated checks in order to effectuate the disbursement of the contractual interest payments.

On page 15, paragraph 35, Ms. Nelson believes that the payout as sales commissions to various persons was higher than alleged in the Superseding Indictment at $2,049,002.

On page 15, paragraph 36, these figures are based on checks written on the company books payable to the defendant but which were used to pay for company expenses such as interest payments to investors and payment of company bills for such things as office products and utilities. Defendant compensated herself for her ownership of and work with the company through

Jeffry K Finer PS
35 W Main Street • Suite 300
Spokane, Washington • 99201
509.464.7611  jeffry@finer-bering.com

a bookkeeping entry called "members withdrawal." Numerous entries designated as "members withdrawal" were in fact expenses attributable to the company. The accounting relied upon by the government does not take these discrepancies into account.

On page 16, paragraph 38, the Court should be aware that the motor home was financed by a $50,000 members withdrawal, and the balance was borrowed from Dennis Nelson's personal credit lines. The Chevrolet Corvette purchase was funded by a $35,000 members withdrawal, and the balance was borrowed from the personal credit lines of Dennis Nelson. The Mercedes Benz was funded by a $30,000 members withdrawal and with $50,000 borrowed by Dennis Nelson from his personal lines of credit. The balance of the purchase priceio was the credit given for a trade-in vehicle previously owned by Dennis Nelson as his separate property.

On page 17, paragraph 40, the Court should be aware that some of the gambling money came from "members withdraw," and some of the money came from defendants' gambling winnings at the Northern Quest Casino at Airway Heights, Washington.

On page 17, paragraph 41, the Court should be aware that, according to defendants' husband, Dennis Nelson, he purchased the artwork with money

Jeffry K Finer PS
35 W Main Street • Suite 300
Spokane, Washington • 99201
509.464.7611 jeffry@finer-bering.com

from a loan he took out at HSBC (Hong Kong British Columbia Bank) . No funds from any business operated by Doris Nelson were used to purchase artwork on the Royal Caribbean Cruise. Both Doris and Dennis Nelson took out loans to fund the trip, and Mr. Nelson paid back both loans.

On page 17-18, paragraph 42, Ms. Nelson offered all investors interest at 10%, not just "some," as the government alleged in the Superseding Indictment.

On page 21, paragraph 48, the indictment alleges that Ms. Nelson said that her company was doing well. This was true because she knew that in 2007 that the company was going to make a small profit for the year.

On page 21-22, paragraph 49, the memo from victim investor Wes Rist (W.R.) does not say who owned the building on West Broadway in Spokane. It reads, "They currently own their own building . . . . " Bates #: 027-001-0001-0035. On pages 22-23, paragraph 50, the company made a small profit in 2007 of approximately $1 million, after writing off bad debt accrued previously.

On page 23, paragraph 51, Ms. Nelson asserts that the company was growing in 2007 and 2008, with Ralph Gamble as managing officer. The company took a $15 million write off for 2008, leaving the company with a

Jeffry K Finer PS
35 W Main Street • Suite 300
Spokane, Washington • 99201
509.464.7611  jeffry@finer-bering.com

net loss of $9 million for the 2008 tax year.

On page 24, paragraph 52, the paragraph suggests that certain companies could not survive out of the fold. However, D & C Lead Marketing is still in business, doing business as Adworkz. 360 Northwest Telecom is still in business, now doing business as Spokane Telephone. The collection company and the computer programmer company were absorbed into the bankruptcy proceedings.

On page 25, paragraph 53, the annual percentage rate for payday loan customers was over 500%, so paying 50% on investment funds was typical for this industry. Further, the TEN YEAR PROMISSORY NOTE provided to investor Moshen Bagherian on July 24, 2007 states that those investment funds will be used to operate any of the companies associated with The Little Loan Shoppe.

On pages 26-27, paragraphs 54-56, at the time the referenced email was sent out, May 6, 2008, The Little Loan Shoppe was not paying for the leads. The Little Loan Shoppe only began paying for the leads around the time of the filing of the bankruptcy.

On page 29, paragraph 57, Anthony Gargiulo, a named victim investor, is a lawyer. Gargiulo visited the offices of The Little Loan Shoppe in order to

Jeffry K Finer PS
35 W Main Street • Suite 300
Spokane, Washington • 99201
509.464.7611   jeffry@finer-bering.com

determine whether he wanted to invest in the company. Mr. Gargiulo was involved in the decision-making process at The Little Loan Shoppe, aiding in deciding what direction the company should take. He acted as a mentor for defendant.

On page 29, paragraph 58, the named victim investor, Wes Rist (WR), was interviewed by Internal Revenue Service Investigator Andrew Menck on September 23, 2010. Menck recorded that conversation in his notes, writing about June 17, 2008, "Rist may have received a call in response" to his inquiry about sending in more investment money to The Little Loan Shoppe.

On page 30, paragraph 59, where the Superseding Indictment speaks about LLS becoming one of the largest companies, it should read "one of the largest on-line loan companies." The Little Loan Shoppe had Eric Olsen, a statistician, on staff. The Little Loan Shoppe also utilized TranDotCom for its internet database for payday loans, and TranDotCom had statistics about the relative size of the LLS operation.

On pages 32-33, paragraph 65, came in after September 23, 2008, company of $50,000. At this time, the Little Loan Shoppe had no new investment money except one loan in December 2008. The funds from loan repayments was used to pay investors interest payments, support new payday

Jeffry K Finer PS
35 W Main Street • Suite 300
Spokane, Washington • 99201
509.464.7611  jeffry@finer-bering.com

loans, and cover the day-to-day expenses of the company.

On page 35, paragraph 70, promissory notes state that the funds invested can be used for business purposes. It was the purpose and intent of the business to support payment of interest on investments through several banks located in Canada and the United States.

## THE LAW

Federal law criminalizes "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses."

The Superseding Indictment outlined the fraud allegations by alleging that Defendant Nelson devised and intended to devise a scheme and artifice to defraud and for obtaining money or property by means of materially false and fraudulent pretenses, representations and promises, which representations and promises were transmitted to the alleged victims by wire or mail.

Wire fraud has three elements: (1) a scheme to defraud; (2) use of wires in furtherance of the scheme; and (3) a specific intent to deceive or defraud. *United States v. Green*, 592 F.3d 1057, 1064 (9th Cir. 2010) .

Mail fraud has as element (2) the use of the mail system. Each individual act committed in a post office of taking out or putting in a letter in furtherance of such scheme is a separate and distinct violation. *United States v.*

Jeffry K Finer PS
35 W Main Street • Suite 300
Spokane, Washington • 99201
509.464.7611  *jeffry@finer-bering.com*

*Anderson*, 59 F.3d 1323, 1337 (D.C. Cir. 1995); *United States v. Joyce*, 499 F.2d 9, 18 (7th Cir. 1974 ); *United States  v . Toney*, 598 F. 2d 1349 (5th Cir. 1979). The "mailing" element of the crime of mail fraud has two requirements: ( 1) that the defendant caused the use of the mails; and (2) that the mailing was "for the purpose of executing" the fraudulent scheme. *See United States v. Stewart,* 185 F.3d 112, 123 (3d Cir.), *cert. denied*, 120 S.Ct. 618 (1999).

Here, the government charges that Doris Nelson solicited investors by promising high yields to be paid from profits derived from payday loans, but that she failed to disclose to those investors that the lending business operations had not been profitable in the past, and, further, that the investors would receive payments on their investments from funds coming to the company from new investors.

## DEFENSE POSITION

The Superseding Indictment charges that Ms. Nelson ran a short-term or payday loan business in which promises were made to investors which were false and misleading. Admittedly, Ms. Nelson owned and operated the payday loan business, The Little Loan Shoppe, until the bankruptcy court took over the business and the bankruptcy court thereafter conducted that business through a trustee appointed by the bankruptcy court.   The Superseding

Jeffry K Finer PS
35 W Main Street • Suite 300
Spokane, Washington • 99201
509.464.7611 jeffry@finer-bering.com

Indictment further charges that false promises were communicated to investors by mail and wire.

In response, Ms. Nelson contends that the business was making a profit until approximately 2008, when the economy began to sour, investments stopped, borrowers could not repay their loans, and The Little Loan Shoppe could not honor its obligations when due. Three expert reports support this: the report by A & M, the forensic accounting firm retained by original counsel; a report by accountant Marie Rice, filed in the bankruptcy proceeding; and the declaration filed by accountant and certified fraud examiner Lenore Romney, also filed in the bankruptcy proceeding.

Ms. Nelson is also charged with seventeen counts of international money laundering. In response, she would argue that there was no intent to engage in unlawful activity, but rather, it was necessary that the various businesses run by Ms. Nelson utilize various banks in both Canada and the United States. These were legitimate business transactions. No banks were defrauded or lost any money from the transfers of money between the various banks utilized by her.

## SENTENCING GUIDELINES

The United States Sentencing Guidelines advise a base offense level of

Jeffry K Finer PS
35 W Main Street • Suite 300
Spokane, Washington • 99201
509.464.7611 jeffry@finer-bering.com

7 on the fraud counts. USSG 2B1.1(a)(1).   Because the number of identified

victims exceeds ten, two points must be added according to 2B1(b)(2)(A).

The government may seek to have 2 points added pursuant to 2B1. 1

(b)(16), asserting that Ms. Nelson derived more than $1 million in gross

receipts from financial institutions.   Ms. Nelson disputes that figure. It is the

intent of that particular portion of the Guidelines that the funds should have

been defrauded from a bank.   That is not the case here.   No bank was

defrauded.   No bank suffered a loss.   Indeed, Ms. Nelson was a valued

customer of Wells Fargo.   She was the only client of her personal business

banker, and because of the volume of her business, he received many bonuses.

Moreover, funds merely passed through the banks utilized by Ms. Nelson and

her companies.

The government may request the Court to increase the total offense

level by adding 22 points based on the alleged amount of loss. 281.1 (b)(1)(L).

The government claims the loss is over $20 million.   However, the

government has refused to share with the defense any information on how they

arrive at that calculation. At one point, prior to the change of plea hearing, the

government wrote:

The bankruptcy examiners findings calculate that NELSON secured

Jeffry K Finer PS

35 W Main Street • Suite 300
Spokane, Washington • 99201
509.464.7611  jeffry@finer-bering.com

approximately $135.4 million (US$ and CAN$ combined) NELSON received from investors and paid out approximately $117.6 million to investors as purported 'interest' and principal payments.

According to the bankruptcy examiner, the net loss appears to be well below the 20 million dollar level at $17.8 million. In the application notes(3) (C) to U.S.S.G. §281.1, it reads:

> Estimation of Loss. The court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based on that evidence. For this reason, the court's loss determination IS entitled to appropriate deference. *See* 18 U.S.C. §3742(e) and (f).

Excluded from the loss calculation is interest of any kind, and amounts based on an agreed-upon return or rate of return. (Application notes, (3)(D) to U.S.S.G. 281.14).    Loss shall be reduced by the money returned by the defendant before the offense was detected. (Application notes, (3)(E) to U.S.S.G. 281.1).   In the case involving a fraudulent investment scheme loss shall not be reduced by the money transferred to any individual investor in the scheme in excess of that investor's principal investment. (Application notes, (3)(F)(iv) to U.S.S.G. 281.1).

Jeffry K Finer PS
35 W Main Street • Suite 300
Spokane, Washington • 99201
509.464.7611  jeffry@finer-bering.com

The government may argue that the offense level should be increased by 2 levels based upon U.S. S. G. §281. 1 (b) ( 16), which calls for an increase if the defendant derived more than $1 million in gross receipts from one or more financial institutions. However, Ms. Nelson argues that this Offense Characteristic does not apply because the funds came from individual investors and not from banks. No financial institution lost any money. The requested 2 level increase would be a misapplication of the section. The application notes shed no light on this issue.

As of the writing of this Memorandum, counsel for Ms. Nelson cannot calculate loss with any precision. As will be supported in subsequent filings, the amount of new information which defense counsel has received in the past ten days is breathtaking. Moreover, until the Court grants funding to retain Marie Rice and Lenore Romney, as well as enable A & M to finish its report, counsel is unable to calculate loss or effectively challenge the government's expert.

### GUIDELINES CALCULATION

Ms. Nelson contends, and the expert's report concurs, that the loss was far less than $20 million. The government has not shown any proof that there were over 250 bona fide victims. The Court should not allow application of

Jeffry K Finer PS
35 W Main Street • Suite 300
Spokane, Washington • 99201
509.464.7611 jeffry@finer-bering.com

U.S.S.G. §2B1.1(b) (16) because the funds were held in financial institutions but did not belong to those financial institutions. Finally, defendant did not move to the United States to avoid Canadian authorities. She married a U.S. citizen who happened to reside in Spokane, Washington.

The money laundering counts are calculated pursuant to U.S.S.G. §2S1.1(a) (1). The calculation involves the use of the offense level for the fraud counts. Thus, we begin with level 25. Since the money laundering charges were pursuant to 18 U.S.C. §1956(a) (2) (A) and (2), U.S.S.G. § 2S1.1 (b) (2) (B) calls for a 2 level increase for a conviction under that statute. U.S.S.G. 2S1.1, Grouping of Multiple Counts, Application note 6 says the counts shall be grouped under 3D1.2(c) (Groups of Closely-Related Counts).

### §3553 FACTORS

On January 12, 2005, the Supreme Court held in *United States v. Booker*, 125 S.Ct. 738, 767 (2005), that the provisions of the Federal Sentencing Act that made the guidelines binding violated the Sixth Amendment. Along with those guidelines, the trial courts are directed to review the language of 18 U.S.C. §3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."

Jeffry K Finer PS
35 W Main Street • Suite 300
Spokane, Washington • 99201
509.464.7611 jeffry@finer-bering.com

Section 3553(s) states as follows:

§ 3553. Imposition of a sentence.

(a) Factors to be considered in imposing a sentence. - The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph ( 2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider --

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed -

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and sentencing range established for -

Jeffry K Finer PS
35 W Main Street • Suite 300
Spokane, Washington • 99201
509.464.7611  jeffry@finer-bering.com

(A) the applicable category of offense committed by the applicable

category of defendant as set forth in the guidelines ....

(B) (Omitted)

(5) any pertinent policy statement -

(A) issued by the Sentencing Commission

(B) (Omitted)

(6) the need to avoid unwarranted sentencing disparities among

defendants with similar records who have been found guilty of similar

conduct; and

(7) the need to provide restitution to any victims of the offense.

## 3553 (A) Factors As Applied to Doris Nelson

(1) NATURE AND CIRCUMSTANCES OF THE OFFENSE AND DEFENDANT

The 110 counts involved a business plan to make payday or short-term, high interest loans over the internet. The business began modestly, but soon grew into a multi-national company doing business on the internet. The company had two parts. The first part took in investments, money to be used in making the small loans to customers. The second part of the company made those loans and tracked the loans. Doris Nelson does not have a high school diploma or any formal business training. She was the proprietor of a payday

Jeffry K Finer PS
35 W Main Street • Suite 300
Spokane, Washington • 99201
509.464.7611 jeffry@finer-bering.com

loan business, eventually becoming the sole owner, after buying out the

interests of early investors. She ran the business as a sole proprietorship, and,

along the way crafted other businesses to assist the main business. One of

those rented the building to The Little Loan Shoppe. Another obtained leads

for the loan section.

The 2008 downturn in the economy hit the business hard. It didn't help

that the business Doris ran promised interest rates in the 60% range. It didn't

help that the company did not make money when the economy was hurting. It

didn't help that the defendant's business unilaterally decided to reduce all the

previously contracted interest rates down to 10%, and then stopped paying

interest to investors altogether. It is clear that Ms. Nelson was in over her head

and trusted others to give her proper advice.   She was dealing with the

lending statutes of Canadian provinces and several states. She had over 150

employees at the height of the business. Her accounting procedures were

insufficient to keep up with the growth of the business.

Repeatedly, the government has cited Ms. Nelson's "lavish lifestyle."

These accusations are baseless.   Many items of jewelry were given to her by

her family long before her business became successful.   The trips were largely

business-related.   John Munding, one of her bankruptcy trustees, noted in his

Jeffry K Finer PS

35 W Main Street • Suite 300
Spokane, Washington • 99201
509.464.7611  jeffry@finer-bering.com

Declaration that when the so-called valuable art was sold, it was akin to "something from Pier One." The Nordstrom card was not a Nordstrom card but rather, a Visa card issued through Nordstrom which was used for all sorts of business-related expenses. And although Ms. Nelson did gamble, all of the funds she used were personal funds.

## (2) THE NEED FOR THE SENTENCE IMPOSED TO REFLECT THE SERIOUSNESS OF THE OFFENSE

The Court must consider the kinds of sentences available for Doris Nelson. Given the nature of the offense to which Ms. Nelson pled, a prison term is certain. What remains to be determined is how the long the sentence should be.

The Court must consult and consider applicable Guideline provisions and Guidelines Policy Statements, but is now permitted "to tailor the sentence in light of other statutory concerns as well, see § 3553(a)." *Booker, 543* U,S. at 245. "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however." *Gall,* 552 U,S. at 49. Under the *Booker-Gall-Kimbrough* line of cases, the Court IS fully empowered to disagree with the Guidelines and Guidelines Policy Statements.

Jeffry K Finer PS
35 W Main Street • Suite 300
Spokane, Washington • 99201
509.464.7611  jeffry@finer-bering.com

The Supreme Court only requires that any such disagreement, and any deviation from the Guidelines range, must be acknowledged and explained by the sentencing court, typically in reference to the § 3553(a) factors.

Doris Nelson respectfully submits that she has given the Court compelling reasons to downwardly depart from the Advisory Guidelines range given the many mitigating factors mentioned in this Sentencing Memo. This is true even assuming the Court considers the Guidelines §2B 1.1 loss table to be rationally based. But the §2B 1.1 Guidelines fraud loss table has little empirical value. The harsh sentencing recommendations of §2B1.1 are not based on past practice or empirical data and have been increasingly rejected by sentencing courts in high-loss, moderate loss, and low-loss fraud cases.

Over the past twenty years, the Sentencing Commission has dramatically increased the severity of sentences for fraud offenders by raising the number of points imposed for the amount of loss and by approving a five-fold expansion in the number of specific offense characteristics. Because the Commission failed to rely on empirical data when making these changes - and thus failed to fulfill its institutional role - sentencing courts have broad discretion to disagree, on policy grounds, with §2B 1.1 's sentencing recommendations. *See Spears*, 555 U.S. 261, 264 (2009) (when the

Jeffry K Finer PS
35 W Main Street • Suite 300
Spokane, Washington • 99201
509.464.7611  jeffry@finer-bering.com

Commission fails to fulfill its institutional role, a district court can vary from the guidelines "based on policy disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case").

When the Sentencing Commission adopted the original guidelines in 1987, it sought to ensure that some white collar offenders faced *"short* but definite period[s] of confinement." U.S. Sentencing Commission, Fifteen Years of Guidelines Sentencing: *An Assessment of How Well the Federal Criminal JusticeSystem* is *Achieving the Goals of Sentencing Reform,* at 56 (Nov. 2004)(hereinafter "Fifteen Year Report"). The Commission thus reduced the availability of probation and adopted a fraud guideline that subjected a defendant to no more than 78 months in prison, even at the highest loss levels. To justify the increase in the rate of confinement above pre-guidelines practice, the Commission explained, without sufficient empirical data, that the definite prospect of prison, though the term is short, will act as a significant deterrent to many of these crimes, particularly when compared with the status quo where probation, not prison, is the norm.. U.S.S.G., Ch. I, intro., pt. 4(d) {I 987).

However, as noted above, the Commission has instead steadily

Jeffry K Finer PS
35 W Main Street • Suite 300
Spokane, Washington • 99201
509.464.7611 jeffry@finer-bering.com

increased the prison sentences for fraud. The Commission has adopted this radical shift in sentencing policy without the support of any empirical data demonstrating the penological value of its substantial increases in sentence severity. *United States v. Aide/son,* 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) (citing Kate Stith & Jose A.Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts,* 69   (1998» .[Be]cause of their arithmetic approach and also in an effort to appear 'objective,' [the Guidelines] tend to place great weight on putatively measurable quantities, such ... [the] amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors."

Because the Commission failed to cite empirical data - and thus failed to fulfill its institutional role - sentencing courts have tremendous discretion to disagree, on policy grounds, with §2Bl.l's recommendations. *See Spears,* 555 U.S. 261, 264 (2009) (when the Commission fails to fulfill its institutional role, a district court can vary from the guidelines "based on policy disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case").

Indeed, "since *Booker,* virtually every judge faced with a top-level corporate fraud defendant in a very large fraud has concluded that sentences

Jeffry K Finer PS
35 W Main Street • Suite 300
Spokane, Washington • 99201
509.464.7611  jeffry@finer-bering.com

called for by the Guidelines were too high. This near unanimity suggests that the judiciary sees a consistent disjunction between the sentences prescribed by the Guidelines [in corporate fraud cases] and the fundamental requirement of Section 3553(a) that judges imposes sentences 'sufficient, but not greater than necessary ' to comply with its objectives." Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After Booker, 20* Fed. Sent. R. 167, 169,2008 WL 2201039, at *4 (Feb. 2008).

Statistics recently released by the Commission confirm this judicial consensus. From October I, 2012 through September 30, 2013, federal district judges imposed sentences in approximately 8, 196 cases in which Guidelines ranges were tallied pursuant (0 the fraud guidelines set out in §2B 1.1 . Fewer than half of all of these cases (4,077) resulted in a sentence imposed within the calculated guideline range, and in well over 2,000 cases judges on their own initiative determined they should depart or vary downward from the sentence suggested by §2BI.I. Indeed, in the more than 1,500 cases since FY 2013 featuring sentences falling below the Guidelines range as a result of a judgment predicated on *Booker,* the median sentence was 12 months, a full 12 months below the average calculated guideline minimum (which represents a median percent decrease of 53%). *See* Mark H. Allenbaugh, *"Drawn From*

Jeffry K Finer PS
35 W Main Street • Suite 300
Spokane, Washington • 99201
509.464.7611  jeffry@finer-bering.com

*Nowhere". · A Review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data,* 26 Fed. Sent. R.19,26 (2013).

Courts have substantially varied from the guideline range based on: (1) policy disagreements with §2Bl.l 's sentencing recommendations, (2) concerns about unwarranted disparities vis-a-vis the many courts who have declined to impose within guidelines sentences in fraud cases, and/or (3) mitigating aspects of a particular defendant's character, good works, and history and/or the nature and circumstances of his or her offense, As discussed at greater length elsewhere in this Sentencing Memo, some of these very same factors, particularly Ms. Nelson's background and character, as well as the uncharacteristic nature and circumstances of the offense, weigh heavily in favor of a variance.

But the lack of empirical validity behind the loss table in Guidelines §2B 1.1 is sufficient justification alone for disregarding, and downwardly varying from, the Advisory Guidelines Range in this matter.

Of course, even if the Court agrees that the Advisory Guidelines Range, as calculated by the U.S. Probation Office and agreed to by the Government, is appropriate for Ms. Nelson's offense, the Court is free to   downwardly vary if on other grounds, if it explains and justifies its reasons.

Jeffry K Finer PS
35 W Main Street • Suite 300
Spokane, Washington • 99201
509.464.7611  jeffry@finer-bering.com

Ms. Nelson requests that the Court not be distracted by the alleged loss calculation or the unduly prejudicial term of "Ponzi scheme." Rather, she requests that it focus the unique circumstances of this offense and her particular vulnerabilities.

(3 and 4) THE KINDS OF SENTENCES AVAILABLE

Whatever the Guideline calculation, Ms. Nelson asks the Court to remember her lack of criminal history, her age, health, and family in Spokane.

(5) OMITTED

(6) THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES

In *Overview of Federal Criminal Cases, Fiscal Year 2012*, the authors cited the following offender statistics after a plea of guilty:

When offenders pleaded guilty, 45.9 percent received a sentence below the applicable sentencing guideline range, either at the request of the government, at their own request, or initiated by the court.

Approximately 62 percent (62.4%) of these below range sentences were requested by the government, usually because the defendant had provided substantial assistance to the government or had agreed to have his or her case handled as part of an early disposition program.

Jeffry K Finer PS
35 W Main Street • Suite 300
Spokane, Washington • 99201
509.464.7611  jeffry@finer-bering.com

This would indicate, therefore, that 37.6 percent of these below range sentences were at the request of the defendant or the decision of the sentencing court.

The <u>2013 Annual Report and Sourcebook of Federal Sentencing Statistics</u> contains tables prepared to illustrate various sentencing characteristics for fiscal year 2013. In Table N-9, COMPARISON OF SENTENCE IMPOSED AND POSITION RELATIVE TO THE GUIDELINE RANGE BY CIRCUIT, the Ninth Circuit had 18,241 total cases. Of those, 6,466 (35.4%) were sentenced within the guidelines. Only 412 were sentenced above the guideline range. The balance of cases, 11,363, were sentenced   at a level below the guideline range. Of those below the guideline range, 2,417 cases were non-government sponsored.

In Table 25 of The 2013 Annual Report and Sourcebook of Federal Sentencing Statistics, the report lists 33 reasons for a downward departure, beginning with criminal history issues (29.7%) and general mitigating circumstances (14.1%) all the way down the list to nonviolent offense/offender (0.4% ).   Some of the reasons also cited in the Table which pertain to Ms. Nelson are her family ties and responsibilities, mental and emotional conditions, age, physical condition, and low likelihood of recidivism/not a risk

Jeffry K Finer PS
35 W Main Street • Suite 300
Spokane, Washington • 99201
509.464.7611  jeffry@finer-bering.com

to the community. Similar numbers exist in the Eastern District Washington

(7) THE NEED TO PROVIDE RESTITUTION TO ANY VICTIMS OF THE OFFENSE.

Ms. Nelson Defendant made available to the United States and to the Bankruptcy Trustee all documents in her possession or under her control which pertain to this investigation and prosecution or the bankruptcy proceedings.

Undoubtedly, the Court will order restitution. How Ms. Nelson can repay that restitution is another matter. All her assets have been seized. Her companies and one of her husband's companies have gone through bankruptcy. Counsel is being paid by Ms. Nelson's family and what few personal funds Mr. Nelson has derived from his salary. For its part, the government has never alleged that Ms. Nelson has hidden assets. Certainly, if Ms. Nelson goes to prison, her ability to repay any restitution will cease. Any amounts of money which the purported victims would receive would be through the bankruptcy proceeding. Therefore, the only purpose a prison sentence would serve would be to satisfy the some of the victims' desire for incarceration apart from financial restitution.

## A VARIANCE IS APPROPRIATE IN THIS CASE

A variance occurs when a judge imposes a sentence above or below the

Jeffry K Finer PS
35 W Main Street • Suite 300
Spokane, Washington • 99201
509.464.7611 jeffry@finer-bering.com

otherwise properly calculated final sentencing range based on an application of the other statutory factors contained in 18 U.S.C. §3553(a). *United States v. Rangel*, 697 F.3d 795, 801 (9th Cir. 2012) *cert. denied,* 133 S.Ct. 1294 (U.S. 2013) *citing United States v. Cruz-Perez*, 567 F.3d 1142, 1146 (9th Cir. 2009).

Advance notice of a variance request is not required by rule. *Irizarry v. United States*, 553 U.S. 708 (2008). If the sentence is procedurally sound and falls within a broad range of reasonable sentences, it will likely pass muster on appeal. *United States v. Treadwell*, 593 F.3d 990, 1015 (9th Cir. 2010); *United States v. Tomko*, 562 F.3d 558, 568 (3d Cir. 2009). Courts have held that variances are not subject to the guideline analysis for departures. *United States v. Furno*, 655 F.3d 288, 317 (3d Cir. 2011), as amended (Sept. 15, 2011). A shorter period of incarceration based on physical and mental disabilities has been authorized by one court. *United States v. Almenas*, 553 F.3d 27 (1st Cir. 2009). Age and poor health may not meet the Guidelines' test for "departure" in the particular case, but sentencing courts nonetheless must consider them if they support a variance under *Booker* and Section 3553. *United States v. Chase*, 560 F.3d 828, 830-31 (8th Cir. 2009); *United States v. Heldeman*, 402 F.3d 220, 224 (1st Cir. 2005); *United States v. White*, 506 F . 3d 635, 640 (8th Cir. 2007).

Jeffry K Finer PS
35 W Main Street • Suite 300
Spokane, Washington • 99201
509.464.7611  jeffry@finer-bering.com

In the universe of fraud, the sticker shock of the losses is significant.

Ms. Nelson's history is remarkable. From a kitchen table in Abbotsford and a need to be home with her children, Ms. Nelson built one of the nation's first online payday loan companies. Without the benefit of a formal financial education or any appreciable business experience, her success was as stunning as it was fragile. The defense does not minimize the evident damage done to her investors. But the perfect storm of economic collapse, bad business, poorly-grounded business acumen, and panic are all sufficient reasons to impose a sentence below the Guidelines. Unlike the traditional high-finance Ponzi schemers, Ms. Nelson provided a legitimate service to thousands of economically disadvantaged consumers from whom no complaint has been heard.

## CONCLUSION

Should the Court proceed with sentencing on November 3, 2014 or on any other date, Ms. Nelson respectfully requests that it be mindful of the fact that she had no prior criminal record, that she was involved in a business which exceeded her wildest dreams and then she found herself in over her head, and that she regrets her actions. Her physical and mental health is poor. She enjoys the love of her husband, children, and grandchildren as well as

Jeffry K Finer PS
35 W Main Street • Suite 300
Spokane, Washington • 99201
509.464.7611  jeffry@finer-bering.com

community here in Eastern Washington.   She therefore requests the mercy of this Court.

DATED this 3rd day of October, 2014.

Respectfully submitted,

_____

/s/Jeffry K. Finer
WSBA No. 14610

_____

/s/Elizabeth Kelley
*Pro Hac Vice*

## CERTIFICATE

I hereby certify that on October 3, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to Caitlin A. Baungard, Assistant United States Attorney.

_____

/s/Elizabeth Kelley

Jeffry K. Finer PS
35 W Main Street • Suite 300
Spokane, Washington • 99201
509.464.7611  jeffry@finer-bering.com